**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a1042n.06

No. 11-3454

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Dec 19, 2013

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| THOMAS L. ROSS, | ) | |
| | ) | ON APPEAL FROM THE |
| Petitioner-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| WARDEN FRANCISCO PINEDA, | ) | |
| | ) | **OPINION** |
| Respondent-Appellee. | ) | |

BEFORE:    DAUGHTREY, COLE and WHITE, Circuit Judges.

COLE, Circuit Judge.  Petitioner-Appellant Thomas Ross appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Ross was convicted of four counts of gross sexual imposition on a person under the age of thirteen, one count of rape of a person under the age of ten, and one count of possession of cocaine.  Because Ross was convicted in state court, AEDPA's stringent standard of review applies to all federal claims the state court reached on the merits.  On appeal, Ross argues that the district court erred in dismissing his prosecutorial misconduct claim and that the failure to disclose exculpatory grand jury testimony violated his right to a fair trial under *Brady v. Maryland*.  We find that Ross cannot prevail on his prosecutorial misconduct allegation nor can he demonstrate prejudice as a result of the trial court's non-disclosure of the grand jury testimony.  Accordingly, we affirm the district court's denial of the writ.

## I. BACKGROUND

## A. Factual Background

The victims in this case, cousins B.B. and D.D., are minor children.  Prior to the abuse, B.B. and D.D. referred to Ross as "Pappaw," because the children's grandmother and Ross were once romantically involved.  When B.B. was about eleven years old and D.D. was around nine, B.B. told his mother that Ross had been touching him and D.D. inappropriately.  On many occasions, Ross would pick up the boys and take them to his house for overnight and weekend visits.  As established at trial, during these visits, Ross would play pornographic movies in the living room and touch B.B. in his private areas with his hands and his mouth.  B.B. testified that Ross purchased cigarettes for him and D.D. almost every time they visited, provided beer and marijuana for the boys to smoke, and took photographs of the boys, sometimes when they were naked.  B.B. and D.D. were not the only boys subject to abuse; other minors, Michael and Billy, also watched pornographic movies at Ross's house, engaged in oral sex with him, and masturbated at his direction.

A jury convicted Ross of four counts of gross sexual imposition, one count of rape of a child under the age of ten, and possession of cocaine.  He was sentenced to five years of imprisonment for each count of gross sexual imposition, to life with parole eligibility after ten years for rape of a child under the age of ten, and to six months for possession of cocaine.

### 1. Prosecutorial misconduct

Ross's habeas petition recites numerous grounds for relief; however, we can only address those issues certified for appeal.  The first issue concerns allegations of prosecutorial misconduct and the second matter involves the trial court's failure to disclose exculpatory grand jury testimony.

Ross claims that instances of prosecutorial misconduct during closing argument deprived him of a fair trial. He offers many examples to support this argument; in fact, each of the statements to which Ross objects is clearly recorded in the trial transcript. First, Ross argues that during rebuttal the prosecutor improperly commented on the credibility of both Ross's and the State's witnesses by telling the jury that B.B. and D.D. "told you [the jury] the truth." The prosecutor also remarked that it was "the job" of the defense attorney to "trip up" the prosecution's witnesses.

Second, Ross argues that the prosecutor improperly accused his attorney of coaching Ross's testimony. The prosecutor observed Ross and his attorney meeting in the hallway during a break in his testimony and commented in the closing that "Ross couldn't get through his direct examination without meeting with his attorney." Ross's counsel objected to this statement; the objection was sustained, but without a corrective instruction.

Third, Ross asserts that the prosecutor violated the prohibition against invoking the "golden rule" by asking the jury to identify with the parents of the victims. Specifically, the prosecutor asked the jury to imagine they were the parents of a child who had been bullied at school, and inquired, "Are you going to turn your back and walk away from that child or are you going to find out what's going on?" Ross's attorney also objected to this question.

Finally, Ross claims that the prosecutor made repeated emotional appeals to the jury. For example, the prosecutor implied that if jurors were experiencing a "creepy feeling in [their] soul[s]," it was coming from Ross. The prosecutor also told the jury that they "don't have to punish these kids"—the alleged abuse victims—as a result of inconsistencies between their testimony and that of other adult witnesses.

2. *Failure to disclose exculpatory material*

In addition to allegations of prosecutorial misconduct, Ross also contends that the State withheld exculpatory evidence that prejudiced the outcome of his trial. As support, he identifies inconsistencies between the bill of particulars and the victims' trial testimony—the former contained allegations of anal rape, while such accusations were absent from the latter. Ross explains that this inconsistency constitutes impeachment evidence, which he was entitled to use against B.B. and D.D. Ross is not certain whether the victims made inconsistent statements because the trial court refused to disclose the grand jury testimony and did not conduct an *in camera* review. Nevertheless, he draws our attention to a report created by Lisa Howze, B.B. and D.D.'s caseworker, and to the wording of the bill of particulars that originated from the grand jury indictment.

Howze works with staff members at CARE House, an advocacy center for child victims. As the victims' caseworker, she observed interviews with the detective in charge of investigating the alleged sexual abuse and prepared a report of her findings. This CARE House report indicated that B.B. told his mother that Ross might have attempted anal penetration. Additionally, the Medical Assessment portion of the report referenced a history of penile-anal contact between Ross and B.B. With anal rape allegations documented in the CARE House report, Ross wanted to cross-examine B.B. about these accusations. The State objected, arguing that B.B. did not make these allegations; instead, it was later established that the information in the report came from investigators or B.B.'s mother. The trial court acknowledged "a state of confusion" with respect to the allegations in the CARE House reports, recognizing that it was a summary of information from "some source." The

trial court ultimately concluded that because the CARE House report was not clearly a statement from B.B., Ross was not permitted to cross-examine him about penile-anal contact.

Outside the presence of the jury, Howze confirmed that neither B.B. nor his mother said that Ross had anally penetrated B.B. Also, B.B.'s mother clarified that her son never told her that Ross had attempted anal penetration. Notably, the trial judge did not include allegations of anal rape in his instructions to the jury. Rather, on each count of rape, the court described the alleged conduct as oral sex.

With respect to the grand jury testimony, Ross contends that because the bill of particulars contained allegations of penile-anal contact, but the victims did not testify about anal penetration at trial, the only plausible explanation is that the victims testified about anal penetration before the grand jury; and this discrepancy justified disclosure of the grand jury testimony. Based on this, Ross contends that he demonstrated a "particularized need" for the transcripts and that the failure to disclose them prejudiced the outcome of his trial. The trial court did not agree and refused to grant his request for disclosure.

Although the grand jury transcripts were not turned over, Ross had the opportunity to question D.D. about contradictory statements related to anal contact. In reference to B.B., the trial judge found little evidence to suggest that B.B. had made allegations of anal penetration, although his mother had been concerned about this possibility.

**B. Procedural History**

*1. State court appeals*

Following Ross's conviction, he appealed to the Ohio Court of Appeals, raising ten assignments of error. The claims relevant to the present discussion include the following: (1) the "culmination of prejudicial error and prosecutorial misconduct," (2) the trial court's failure to grant a new trial as a result of the prosecutor's failure to turn over exculpatory evidence, and (3) the trial court's failure to produce the grand jury testimony.

The court of appeals affirmed Ross's conviction. It held that (1) the "prosecutors' actions, either individually or cumulatively, did not deprive Ross of a fair trial" because they did not prejudice Ross, (2) the trial court did not abuse its discretion in declining to grant a new trial, and Ross's attorney was given sufficient opportunity to review and question witnesses regarding exculpatory evidence turned over during the course of trial rather than beforehand, and (3) the trial court did not abuse its discretion in finding that Ross had "no particularized need" for the grand jury testimony.

In response, Ross filed a motion for reconsideration and/or en banc review in the court of appeals. This motion focused entirely on the court's holding regarding evidentiary matters, and specifically, whether Ross should have been given access to grand jury testimony to impeach prosecution witnesses. The court of appeals denied the motion.

Next, Ross appealed to the Ohio Supreme Court. His accompanying memorandum of jurisdiction alleged that the trial court was required to produce the grand jury testimony for his

review due to inconsistencies between the bill of particulars and the testimony of witnesses at trial. Additionally, he argued that he was denied a fair trial because of the prosecutors' "emotional plea to the jury, accus[ation of] defense counsel of wrongdoing, and comments on the credibility of witnesses." The Ohio Supreme Court denied Ross's discretionary leave to appeal.

### 2. *Federal habeas petition*

Ross timely filed a habeas corpus petition in the United States District Court for the Southern District of Ohio. He argued five grounds for relief, including, again, prosecutorial misconduct during the closing arguments, the State's non-production of grand jury testimony, and the State's failure to turn over other exculpatory materials. The district court noted that "[f]ailure to present an issue to the state supreme court on discretionary review constitutes procedural default," and accordingly found three of the five grounds of relief to have been defaulted. Therefore, the district court only reached the merits of only the prosecutorial misconduct claim and the argument pertaining to grand jury testimony, though the court further questioned whether Ross had presented the grand jury claim as a federal constitutional issue, rather than a purely state law issue. Finding no "objectively unreasonable application of clearly established Supreme Court law," the district court dismissed the petition and did not reach a final decision on the presentment issue.

Ross timely filed a notice of appeal and motion for a certificate of appealability ("COA"). Ross's motion addressed only the two claims that were not procedurally defaulted: prosecutorial misconduct and non-production of the grand jury testimony. The motion did not challenge the

district court's determination that some of Ross's claims had been defaulted. The district court

issued the COA as to the two non-defaulted claims.

## II. ANALYSIS

For habeas petitions, this Court reviews a district court's legal conclusion de novo and its

factual findings for clear error. *Adams v. Holland*, 330 F.3d 398, 400 (6th Cir. 2003). The

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires us to deny habeas relief

to a claim adjudicated by a state court on the merits unless the state court's decision "(1) was

contrary to, or involved an unreasonable application of, clearly established federal law as determined

by the Supreme Court;" or "(2) was based on an unreasonable determination of the facts in light of

the evidence presented to the state courts." 28 U.S.C. § 2254(d). A state court decision is contrary

to law as established by the Supreme Court if it "arrives at a conclusion opposite to that reached by

[the Supreme Court] on a question of law" or if the "state court confronts facts that are materially

indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result.

*Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under AEDPA, a state court's factual determinations

are presumed to be correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of

demonstrating, with clear and convincing evidence, that the state court's factual determinations were

unreasonable. *Id.*

This heightened standard applies even if the state court hearing the petitioner's appeal or

collateral challenge *does not* address the defendant's federal claims in affirming his conviction. As

the Supreme Court recently held in *Johnson v. Williams*, when this situation occurs, "the federal

habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." 133 S. Ct. 1088, 1091 (2013). The "restrictive standard of review set out in § 2254(d)(2)"—requiring an unreasonable application of the law or determination of the facts—"consequently applies" in such circumstances. *Id.* at 1092.

The Supreme Court has clarified that the correct standard for habeas review under AEDPA establishes a "'substantially higher threshold' for obtaining relief than *de novo* review": the state court's decision must be not merely incorrect, but "unreasonable." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation omitted).

## A. Prosecutorial Misconduct

### 1. Legal standard

We look first to Supreme Court precedent, as AEDPA requires, to determine when prosecutorial misconduct demands habeas relief. *Darden v. Wainright* establishes that the applicable question is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) ("The 'clearly established Federal law' relevant here is our decision in *Darden* . . . ."). Prosecutorial misconduct that does not "deprive petitioner of a fair trial" will not give rise to habeas relief; in other words, the misconduct must be so serious that it implicates a petitioner's due process rights. *See Darden*, 477 U.S. at 180.

Ross's brief acknowledges *Darden*'s standard but looks to Sixth Circuit precedent to supply its substance. The Supreme Court has unequivocally stated that, under AEDPA's standard of review, "circuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court." *Parker*, 132 S. Ct. at 2155 (citing *Renico*, 599 U.S. at 777). Rather, this Court must rely on the "highly generalized" standard for prosecutorial discretion laid out in *Darden*. *Id.* Moreover, to grant relief, we must find that the Ohio Court of Appeals acted unreasonably in its interpretation or application of that standard. *Renico*, 559 U.S. 773.

Although the district court surmised that Ross can use Sixth Circuit precedent for "what i[t] means to be objectively unreasonable in applying" Supreme Court precedent, we cannot assume that our own cases "reflect what has been 'clearly established'" by the Supreme Court. *Parker*, 132 S.Ct. at 2155. Thus, Ross cannot rely on the two-part test for prosecutorial misconduct articulated by this Court in *United States v. Carroll*, 26 F.3d 1380, 1385–86 (6th Cir. 1994), which asks if the prosecutor's conduct is improper and flagrant. *See Parker*, 132 S. Ct. at 2155 (rejecting the use of this test). As a result, the Sixth Circuit case law cited in Ross's brief is of limited applicability. Ross relies heavily on *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005), with facts similar to those presented here, to argue that the alleged misconduct of his prosecutors meets the *Darden* standard. But in light of *Parker*, we cannot rely on *Hodge* for precedential value; rather, the conduct of Ross's prosecutors must have amounted to such a clear violation of *Darden* that the state court's failure to identify the violation was "not merely incorrect but unreasonable." *Renico*, 559 U.S. at 773.

We look to the "last reasoned state court opinion" to determine whether relief is appropriate under AEDPA. *See Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010). The Ohio Court of Appeals decision, affirming Ross's conviction, looked entirely to state law to determine whether Ross had suffered prejudicial error. Under *Johnson v. Williams*, we presume that the court decided Ross's federal claims on the merits. 133 S. Ct. at 1096. Ross has not made an argument to rebut this presumption, and the Ohio cases cited by the state court articulate a standard for prosecutorial misconduct similar to, and not less stringent, than the U.S. Supreme Court's standard in *Darden*, 477 U.S. at 181–82. *See, e.g.*, *State v. Lott*, 555 N.Ed.2d 293, 300–01 (Ohio 1990) ("The test for prosecutorial misconduct is whether remarks are improper, and, if so, whether they prejudicially affected substantial rights of the accused. . . . [B]oth the prosecution and the defense have wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom . . . . Prosecutors must avoid insinuations and assertions calculated to mislead."); *State v. Braxton*, 656 N.E.2d 970, 979 (Ohio Ct. App. 1995) (noting prosecutor's improper conduct, but finding, "beyond a reasonable doubt, that the jury would have found [the defendant] guilty absent the prosecutor's remarks."). Therefore, we deem this an adjudication of Ross's federal claim on the merits.

*2. Claims of prosecutorial misconduct and procedural default*

Ross's brief contains many examples of alleged prosecutorial misconduct. We limit our discussion, however, to the four particular instances identified in the COA: emotional appeals to the jury, violation of the "golden rule," accusations that defense counsel coached Ross's testimony,

and commentary on the credibility of witnesses. As the district court's decision granting the COA notes, Ross's petition to the district court identified eight incidents or patterns of misconduct. However, the district court found four of these incidents procedurally defaulted because they were not presented to the Ohio Supreme Court. Additionally, Ross did not challenge the district court's finding of procedural default in his motion for a COA. Thus, the district court correctly did not include these claims in the scope of its COA.[1] *Cf. Seymour v. Walker*, 224 F.3d 542, 561 (6th Cir. 2000) (refraining from consideration of claims not raised before the district court in the petitioner's habeas petition and not within the scope of the COA); *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000).

If an alleged instance or pattern of misconduct identified in Ross's briefs does not fit into one of the four instances of prosecutorial misconduct preserved for appeal, it is considered defaulted and is not address below.

### 3. *Emotional appeals to the jury*

Ross claims the prosecution's rebuttal contained statements improperly designed to appeal to the emotions of the jurors. Specifically, Ross points to one statement that he characterizes as a

---

[1]Ross's motion for a COA briefly refers to the district court's finding regarding procedural default of the prosecutorial misconduct claims: "This Court . . . held that the state court's decision did not unreasonably apply the law as established by the U.S. Supreme Court . . . . Petitioner respectfully asserts that reasonable jurists could disagree with this conclusion and that his claim deserves further encouragement." But in neither this section of the motion, or in any other section, does Ross directly dispute the district court's finding that some of his prosecutorial misconduct claims were defaulted.

"suggestion that not delivering a guilty verdict would be punishing the alleged victims." The

prosecutor stated:

> And just look at what these kids went through just to get to this point, to get this case
> to you . . . . And you don't have to punish these kids because of how adults
> interviewed them or typos in notes.

Ross also identifies another statement, made only a minute or two later, as impermissible:

> And if there is a creepy feeling in your soul, I'd submit to you it's not from the kids.
> It's from someone else in here.

The Ohio Court of Appeals did not find that the first comment was an emotional appeal. In

the court's view, "[t]his comment was directed to the credibility of the children's statements and the

alleged inconsistencies upon which the defense had placed great emphasis." As to the second

statement regarding a "creepy feeling," the court "agree[d] with Ross that it was inappropriate," and

characterized the statement as "inflammatory" and devoid of "evidentiary value." However, the

court found it "unlikely" that this particular comment prejudiced Ross.

In *Darden*, the Supreme Court held that a series of inflammatory, highly improper remarks

made by the prosecutor in closing were not sufficient to deprive the defendant of a fair trial. 477

U.S. at 178–83. There, the prosecutor opined that the defendant "shouldn't be out of his cell unless

he has a leash on him and a prison guard at the end of that leash," repeatedly stated that he

personally wished the defendant had died at his own hand or someone else's during the commission

of the crime, and "implied that the death penalty would be the only guarantee against a future similar

act." *Id.* at 180 & n.12. In determining that these antics had not rendered the trial unfair, the Court

considered the content of the defense's summation, the instructions given to the jury, and the overall

weight of the evidence against the defendant. *Id.* at 182.

Although these context-specific findings make it difficult to compare precisely *Darden* and

the case at hand, *Darden* demonstrates that prosecutorial misconduct does not violate one's right to

a fair trial unless it is egregious. The Ohio Court of Appeals did not act unreasonably in finding that

this standard was not met.

*4. "Golden rule" argument*

Ross argues that prosecutors presented an impermissible "golden rule" argument to the jury,

asking them to "to take on the role of parents of children who had just been bullied, with Ross in the

role of 'bully.'" During closing argument, one of the prosecutors stated:

> I would just ask you to consider this. You have two children. They come home from
> school and one of them says the other one just got bullied at school that day. You
> go to your child and say what happened at school today . . . . and the child says
> nothing happened, and you say, well, your brother told me something happened.
> Your child starts to cry and says through tears nothing happened. Are you going to
> turn your back and walk away from that child or are you going to find out what's
> going on. Alice Walker said the most important question in the world is why is the
> child crying. Ladies and gentleman, I think you know the answer to that.

The Court of Appeals responded to this claim by noting that "the prosecutor did not ask the jurors

to imagine that their children were the victims of sexual abuse." In the court's view, the prosecutor

had "made an analogy" in order to "mak[e] the point that anyone in a similar situation with a child

would follow up with additional questions," as one of the prosecution's witnesses did. Although

the court stated that the prosecutor "should not have asked the jurors to imagine themselves in a

situation similar to one described at trial," it determined that the prosecutor did not encourage the

jury to be "unduly emotional" and that the jury was instructed that closing arguments were not evidence.

Supreme Court precedent does not directly address a prosecutor's use of a "golden rule" argument. Moreover, to the extent Sixth Circuit precedent can guide our analysis, this Court has declined to grant habeas relief to petitioners alleging that their prosecutors made similar statements, even in the context of other alleged misconduct. *See Bowling v. Parker*, 344 F.3d 487 (6th Cir. 2003) (citation omitted); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 333 (6th Cir. 2012), *cert denied*, 133 S. Ct. 311 (2012). Thus, the Ohio Court of Appeals did not unreasonably dismiss this claim.

*5. Accusation that defense counsel coached petitioner*

Ross further claims that prosecutors accused his defense counsel of coaching his testimony. The prosecutor delivering the rebuttal stated:

> [The defense's expert witness] never said that these kids were coached. . . . And they [the defense] want to talk about coaching. This defendant couldn't get through his direct examination without meeting with his attorney in the hallway during a break.

Noting that the defense attorney objected, and that the objection was sustained, the court determined that although "the trial court could have provided a more thorough instruction for the jury to ignore this remark, . . . we are unpersuaded that the comment affected the outcome of the trial."

In *Parker v. Matthews*, the Supreme Court reversed this Court's holding that a prosecutor engaged in misconduct so severe as to deny the petitioner due process. 132 S. Ct. 2148, 2153–55. In particular, the Supreme Court held that the prosecutor's "suggestion" that "[the defendant] had

colluded with his lawyer . . . and with [his witness] to manufacture an extreme emotional disturbance defense" did not violate *Darden* in light of a statement that followed, in which the prosecutor "expressly disavowed any suggestion of collusion." *Id.* Similarly, here, the allegedly offending statement of Ross's prosecutor led the court to sustain an objection and instruct the jury— however tersely—that the statement was "not in evidence." Again, the Ohio Court of Appeals did not reach an unreasonable conclusion.

*6. Commentary regarding the credibility of witnesses*

Lastly, Ross claims that prosecutors commented on the credibility of witnesses during rebuttal, including the following:

> How many hours did [the alleged victims] sit up there [at the witness stand]? How many confusing questions did these kids have to answer? And they never wavered. *Because they told you the truth.* And let me just ask you this: Did it look like any of those children enjoyed coming in here?

And:

> . . . I'm not surprised that a defense attorney with thirty-five years' experience was able to confuse and trip up a few kids. That's his job.

The court acknowledged that prosecutors should refrain from commenting on the credibility of witnesses. However, it also found it "proper" for the prosecution "to point out that the State's witnesses, particularly the children, had been consistent about their stories despite intense and lengthy cross-examination." Therefore, the court failed to find any prejudice as a result of this comment.

Again, there is no Supreme Court precedent directly on-point. Precedent from this Court indicates that it is permissible for a prosecutor to argue, based on facts before the jury, that a witness lacked a motive to lie. *See United States v. Henry*, 545 F.3d 367, 379 (6th Cir. 2008). Additionally, it is not improper for a prosecutor to state that a particular witness is "telling the truth," so long as he or she does not "express a personal belief in the witnesses' credibility or imply that the prosecutor had special knowledge of facts not before the jury." *Wilson v. Bell*, 368 F. App'x 627, 634–35 (6th Cir. 2010) (in sexual assault case involving minor victim). And even then, this Court is unlikely to find that a prosecutor's statement that he or she *personally* believes the victims to be "sufficiently flagrant to warrant reversal." *Id.* at 635. The Ohio Court of Appeals did not act unreasonably in finding no violation of clearly established federal law.

*7. Contextual and cumulative effect of prosecutors' statements*

Finally, Ross's brief notes that "[a] prosecutor's misconduct, and the effect of that misconduct, is not to be considered as a series of individual incidents" but can be "adequately judged only in the larger context of an entire trial." The Supreme Court has acknowledged as much. Determinations as to the impropriety or effect of a prosecutor's conduct at trial should account for the broader context in which the prosecutor's conduct took place. *See Darden*, 477 U.S. at 182. A court may consider, for example, whether a prosecutor's allegedly improper commentary during closing "was invited by or was responsive to" the defense's closing, whether jurors received instructions from the judge to mitigate an attorney's missteps, and whether the evidence against the

defendant was ample or scant. *See id.* Additionally, the "cumulative effect" of multiple acts of misconduct may be considered. *Berger v. United States*, 295 U.S. 78, 89 (1935).

In its opinion affirming Ross's conviction, the state court addressed each alleged instance of prosecutorial misconduct. Only in passing did it note that the cumulative effect of the prosecutors' actions "did not deprive Ross of a fair trial." However, the court did endeavor to explain the circumstances surrounding several of the improper comments, and at any rate, its brief reference to the cumulative effect of the comments demonstrated that the court was aware that several isolated instances of misconduct could result in an unfair trial. Ultimately, under the stringent AEDPA standard and the applicable federal law, namely *Darden*, the court of appeals did not engage in an unreasonable application of federal law or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

**B. Fair Presentation**

Relying on *Brady v. Maryland*, Ross also claims habeas relief should be granted because he was denied access to exculpatory grand jury testimony. Before reaching the merits of his *Brady* claim, we must first decide whether Ross has "fairly presented" this issue as a matter of federal constitutional law. The federal right implicated in this case is whether the non-disclosure of potentially exculpatory grand jury testimony violated Ross's due process right to a fair trial. The district court held that Ross failed to preserve this constitutional challenge because he merely cited *Brady* in passing and without argument. But we find that he met the fair presentation requirement.

Under AEDPA, a petitioner must exhaust all available remedies in state court. *See* 28 U.S.C. § 2254 (b), (c). A habeas petitioner satisfies the exhaustion requirement when the "highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims." *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). In other words, each issue must be "fairly presented" to the state courts. *See, e.g.*, *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Fraizer v. Huffman*, 343 F.3d 780, 797 (6th Cir. 2003). To determine whether a petitioner "fairly presented" a federal constitutional issue to the state courts, we have looked to the petitioner's

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*Whiting v. Burt*, 395 F.3d 602, 613 (6th Cir. 2005); *see also McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (holding that "[g]eneral allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated.") Nevertheless, a petitioner is not required to cite "book and verse on the federal constitution." *Picard v. Connor*, 404 U.S. 270, 278 (1971) (internal quotation and citations omitted).

After reviewing Ross's briefs to the Ohio Court of Appeals, and his memorandum of jurisdiction to the Ohio Supreme Court, Ross has satisfied the exhaustion requirement under AEDPA. In his state court brief, he argued succinctly that *Brady* requires the prosecution to reveal exculpatory information, including evidence in the form of grand jury testimony. Beyond naming

the constitutional issue explicitly, Ross also delineates the three requirements under *Brady* and considers how the Supreme Court has defined materiality in that case. Ross also provides a basic factual explanation for his argument, by articulating that the victims' grand jury testimony was inconsistent with the testimony given at trial. Failure to reveal the transcripts, he concluded, violated his due process right to a fair trial.

Similarly, in Ross's reply brief before the Ohio Court of Appeals, he again invokes *Brady*, laying out the applicable standard, and describing how that case applies to the present analysis. Ross further acknowledged that "*Brady v. Maryland* sets a constitutional minimum requirement for due process" and cited *Dennis v. United States*, a Supreme Court decision, for the proposition that "[d]isclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." Ultimately, Ross fairly presented his federal claim to the Ohio Supreme Court by identifying *Brady* as the well-established Supreme Court precedent.

The court of appeals—while acknowledging that Ross raised a *Brady* claim—did not address the merits of this federal issue. Instead, the court confined its analysis to the application of state law, specifying that the decision to reveal grand jury testimony is within the trial court's discretion. It is true that Ross engaged in a more robust discussion of the grand jury issue by way of state law. To be sure, he cited numerous state court decisions to support his argument. Notwithstanding the detailed state law explication, however, Ross plainly articulated the federal basis of his claim to the state court by acknowledging expressly that grand jury testimony, if it is exculpatory, falls under *Brady.*

Whether the state court understood itself as presented with a question of federal law is not dispositive. The Supreme Court in *Dye v. Hofbauer* held that the "failure of a state appellate court to mention a federal claim does not mean the claim was not presented to it. It is too obvious to merit extended discussion that whether the exhaustion requirement . . . has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in petitioner's brief in the state court." 546 U.S.1, 6–7 (2005). The petitioner in *Dye* fairly presented his claim by articulating in a state court brief that he was denied due process of law and linked his argument to four federal cases, all of which addressed due process violations.

In like manner, Ross framed his argument in terms of the pertinent constitutional law by referencing *Brady*, he examined the elements to sustain a cause of action under *Brady*, and he relied on federal cases employing the appropriate constitutional analysis, by citing *Dennis* for the proposition that disclosure promotes the fairness of criminal trials and by mentioning this Court's decision in *United States v. Farley,* 2F.3d 645 (6th Cir. 1993). In *Farley*, we asked whether *Brady* could be used to overcome the presumption of secrecy in grand jury proceedings. Even if the factual support for Ross's constitutional claim is underdeveloped, the Supreme Court has recognized that merely labeling a claim "federal" sufficiently preserves the issue. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Indeed, the fair presentation requirement does not mandate extensive elaboration: "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds . . . .'" *Baldwin*, 541

U.S. at 32. Thus, when Ross invoked *Brady* and incorporated footnotes to *Dennis* and to our decision in *Farley*, he sufficiently preserved his federal claim.

According to the State, the cases Ross mentions do not "provide the clearly established Supreme Court precedent" relevant to his claim as they involve the application of Ohio Crim. R. 6(E), and do not engage in a constitutional analysis. Even if we assume the State is correct, that Ross "cited the wrong cases in support of his constitutional claim is no basis for default." *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006). Since a petitioner is not required to cite cases applying federal constitutional principles where he has articulated his claim in terms of a denial of a specific constitutional right, "penalizing a party for citing the wrong cases would create the perverse incentive to cite no cases at all." *Fulcher*, 444 F.3d at 798; *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

Because Ross fairly presented his federal claim, he provided the state court with a full and fair opportunity to address his argument premised on *Brady*. Therefore, we will not dismiss this issue on state exhaustion grounds.

**C. Ross's *Brady* Claim**

Finding that Ross fairly presented his federal claim, we examine whether *Brady* requires the disclosure of grand jury testimony in this case.[2] With respect to the appropriate standard of review, in a case like this, where a state court does not address a federal claim, "a federal habeas court must

---

[2]In lieu of seeking disclosure, Ross also asked the trial court to conduct an *in camera* review of the grand jury transcripts. However, that issue was not certified in the COA and is not addressed herein.

*presume* that the federal claim was adjudicated on the merits" and "that the restrictive standard of review set out in § 2254(d)(2) consequently applies." *Williams*, 133 S.Ct. at 1096, 1092 (emphasis added). Based on this, the Ohio Court of Appeal's decision was not "unreasonable" or "contrary" to the Supreme Court's interpretation of federal law.

*1*. Brady *and its progeny*

In the seminal case of *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." 373 U.S. 83, 87 (1963). Under *Brady*, a defendant must show "(1) suppression by the prosecution after a request by the defense, (2) the evidence's favorable character for the defense, and (3) the materiality of the evidence." *Moore v. Illinois*, 408 U.S. 786, 794 (1972). *Brady* imposes a duty to disclose exculpatory evidence "even though there has been no request by the accused." *Stickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). Impeachment evidence is also encompassed within the *Brady* rule because a jury's reliance on the credibility of a witness can be decisive in determining the guilt or innocence of the accused. *See United States v. Bagley*, 473 U.S. 667, 676 (1985).

A defendant's right to exculpatory evidence must, however, be reconciled with the "long-established policy that maintains the secrecy of the grand jury proceedings in federal courts." *Dennis v. United States*, 384 U.S. 855, 869 (1966). Grand jury proceedings, though traditionally cloaked in secrecy, can be used to impeach a witness's testimony. *Id.* at 869. Trial courts can reveal

grand jury testimony, or relevant portions thereof, if a defendant shows a "particularized need" to impeach a witness, to refresh his recollection, or to test his credibility. *Id.* at 870.

Applying *Brady* and *Dennis*, we find no violation of clearly established Supreme Court precedent. Ross argues that he is entitled to the grand jury testimony to show inconsistencies in the victims' trial testimony. Speculating that the grand jury testimony contained impeachment evidence, he claims that not divulging the transcripts prejudiced the outcome of his trial. His suspicions were aroused when the bill of particulars included accusations of anal penetration or attempted anal penetration. From here, Ross leaps to the conclusion that the bill of particulars is "only explicable" if the victims testified about anal sex before the grand jury. If such accusations were made before the grand jury, Ross argues that it was "manifestly unfair" to prevent him from using the testimony to cross-examine the victims.

Ross's conclusion is flawed. The bill of particulars states that Ross engaged in sexual behavior that "include[d], but was not limited to, oral sex being performed on the victim, the victim performing oral sex on the defendant *and/or* anal sex performed on the victim." This wording, according to the state court, suggested that anal sex was "a possible form of sexual conduct." But the evidence adduced at trial did not establish this offense, nor did the trial court instruct the jury on anal rape. As the court of appeals accurately observed, because the probability that anal rape had been mentioned in the grand jury was slim, Ross did not demonstrate a particularized need for disclosure and was not deprived of a fair trial.

*2. Materiality under* Brady

Given the improbability that the grand jury testimony contained impeachment evidence, Ross fails to demonstrate materiality under *Brady* and thus cannot sustain his high burden of proving that the state court's conclusion was "unreasonable" or "contrary" to, clearly established federal law. Evidence is material if there is a reasonable probability that had the evidence been revealed, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 678. But "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Agurs*, 427 U.S. at 109–10. Furthermore, a constitutional violation under *Brady* occurs only where a prosecutor's "omission is of sufficient significance to result in the denial of defendant's right to a fair trial," or "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 676, 679. In determining materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289–90 (quoting *Kyles v. Whitely*, 514 U.S. 419, 434 (1995)) (internal quotation and citations omitted). When the omission is evaluated in the context of the entire record, we conclude that Ross fails to satisfy the materiality requirement under these standards.

Neither Ross nor this Court can declare with certainty whether the grand jury testimony in this case contained favorable impeachment evidence, as the trial court did not conduct an *in camera* review, or give Ross an opportunity to inspect the transcripts. Perhaps the testimony would have

revealed an inconsistency; however, the "mere possibility" that undisclosed evidence may have assisted the defense does not rise to the level of materiality as contemplated by Supreme Court. *Agurs*, 427 U.S. at 109–10. There are several reasons to believe the grand jury testimony did not contain impeachment evidence. We agree with the Ohio Court of Appeals that both the parties and the court expended a substantial amount of time and effort during the trial considering Ross's inferences that B.B. and D.D. had made prior statements about anal contact with Ross. In the end, allegations of anal rape likely came from statements made by third parties and not from the victims. Indeed, neither B.B. nor D.D. testified at trial that Ross engaged in anal contact. The evidence shows that B.B.'s mother was concerned about the *possibility* that Ross had attempted anal penetration. However, she stated unambiguously that B.B. denied penile-anal contact with Ross. Therefore, even if Ross had access to the transcripts, it is likely that the testimony he sought contained little, if any, impeachment value.

Furthermore, Ross was not prejudiced because even if the testimony had been revealed, the result of the proceeding would not have been different. Had the grand jury testimony contained allegations of anal penetration, B.B. and D.D.'s in-court testimony regarding oral rape would have been sufficient to support Ross's conviction. Allegations of anal penetration, whether alleged or not, do not necessarily cast doubt on Ross's guilt with respect to the oral rape charges. Contrary to Ross's argument that the grand jury testimony would have "undercut the prosecution's evidence against him," there is nothing to suggest that Ross was prejudiced by the trial court's refusal to provide access to the transcript.

In short, given that Ross has failed to establish materiality under *Brady*, he was not entitled to disclosure of the grand jury transcripts. Accordingly, the state court's decision was not "unreasonable" or "contrary" to Supreme Court precedent.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of the writ of habeas corpus.